[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action in tort brought by the plaintiff, Canton Pruitt (hereinafter also "Pruitt") against Main Tower, Inc., doing business as Main Tower Café Lounge at 3229 Main Street Hartford, Connecticut, Ernest James, also known as Pete James (hereinafter also "James") and Gordon Newkirk (hereinafter also "Newkirk") for damages resulting from the shooting of Pruitt by Newkirk on the premises of Main Tower Café Lounge during the evening of May 27, 1994. A motion to dismiss as to Newkirk was granted on July 14, 1997, Hennesy, J which is not surprising since none of the counts in the complaint were against Newkirk.
This was a court trial held before this Court on five days between November 27, 2001 and January 9, 2002 inclusive.[1] Initial briefs were filed by the parties as well as reply briefs dated February 20, 2002. CT Page 3441
 LEGAL STANDARD
In a civil action such as this the burden is on the plaintiff to prove his allegations by a preponderance of the evidence. Further, this Court has based its decision in part on the credibility of the witnesses who testified at trial. The evaluation of their credibility has been based upon their demeanor on the witness stand, the consistency or inconsistency of their testimony and the inconsistency of such testimony with other witnesses' testimony and exhibits, the ability to recall events as well as the interest the witness has in the outcome of the case and when a party testifies, a review of his prior criminal record.
 FACTS
From the totality of the evidence, the Court finds that the Main Tower Café was on the evening of May 27, 1994 a retail bar and grill located in Hartford, Connecticut open to the general public. Main Tower, Inc. was the backer of the liquor license, James was the permittee thereof and the said corporation was solely owned by James who was the president. During the late evening of May 27, 1994, Pruitt attempted to enter the premises to retrieve his cell phone and/or purchase alcoholic beverages and food. Newkirk was employed at said premises as a bouncer and/or doorman and/or guard etc., who at the entrance collected admission fees charged to people who wanted to enter the premises. When Pruitt attempted to enter the premises, he was assaulted by Newkirk causing Pruitt to be momentarily unconscious. Friends of his helped him out of the premises. Within approximately the next half hour, Pruitt again attempted to enter the premises and was shot in the stomach by Newkirk using a 357 Magnum. Pruitt was immediately taken to St. Francis Hospital where he spent approximately two weeks during which time the bullet was removed.
The evening of the shooting a Hartford softball league was allowed to utilize the premises for a fund-raiser. The admission price was kept by the softball league, but the proceeds from the sale of liquor and food was retained by the defendants.
As for the credibility of the witnesses, the Court found both James and Pruitt lacking in credibility, believed some of their testimony but not all of it. James testified that he was not aware of any drugs being sold inside the bar and grill, that they were sold only outside the establishment. This the Court finds not believable. Also, at times James appeared confused, did not report to the police that Pruitt had a gun when he entered the premises the second time but now recalls more than seven years later that someone told him that evening that Pruitt had a gun when he entered the second time. The witness appeared to have a convenient CT Page 3442 memory.
As for Pruitt the Court has taken into account that he has been convicted of forgery in the second degree at least twice and larceny in the second degree all of which are felonies which involve a lack of veracity and impeach his integrity. Further, he told the police when he was at St. Francis Hospital the night of the shooting that he did not know who shot him, yet in fact he did know that it was Newkirk. This may have been attributable to his being in shock and in pain. However, as with James, the Court has believed some of what Pruitt said but not all of it.
 ISSUES
1. Were Newkirk's Actions That Evening The Responsibility of The Softball League or The Defendants?
Newkirk was not paid for his work that evening, but was rather a volunteer. Even though he was in his customary position at the entrance and collected entrance fees for the softball league, he was also acting on behalf of the defendants in that the bar was open for food and drink the payments for which were retained by the defendants. The Court, therefore, concludes that his position as a bouncer/doorman/guard and his actions thereunder were at least in part on behalf of the defendants.[2]
The defendants cannot escape liability by transferring it to the softball league.
2. Are The Defendants Vicariously Liable For The Acts of Newkirk?
The Court must first address the issue of whether or not Pruitt was carrying a gun when he returned to the entrance and was then shot. There was no direct evidence presented to this Court that Pruitt was in possession of a gun at that time. There was, of course, Pruitt's testimony that he did not have a gun at any time. Additionally there was the testimony of James Biggs who was in charge of the fundraiser for the softball league. He testified that he was standing in the doorway when Pruitt returned. He believed that Newkirk was standing on the ledge in the area where
the tickets were sold. He did not believe that Pruitt had a gun. He stated in answer to the Court's question that he believes that he would have seen a gun if it was in Pruitt's hand.
Additionally, the only witness who claimed to have seen Pruitt with a gun was Newkirk. However, his statement to James for the purposes of whether or not Pruitt had a gun was out of court hearsay because Newkirk CT Page 3443 was not available during the trial to testify, and he did not testify. Counsel for the defendants presented several witnesses as to the criminal background of Pruitt, as to his being considered a member of a gang, as to his propensity for violence and that he was part of the criminal element. Counsel at the trial, although not emphasizing this in the defendants' briefs, urged the Court to draw an inference from Pruitt's "bad character" that Pruitt carried a gun that night. This Court asked Sergeant Lyons of the Hartford Police Department whether he ever saw Pruitt with a gun. He answered no and that if he had seen him with a gun he would have arrested him. This Court finds such an inference to be unreasonable. It is a giant leap to find that because there were many negative comments about Pruitt in the testimony as previously cited, that meant he was carrying a gun into the bar and grill. Accordingly, the Court concludes that there is no evidence that Pruitt possessed a gun when he was in the subject establishment. The gun that he allegedly had was never found at the scene or in the car that drove him to the hospital or in the hospital itself. It is certainly possible that the gun was taken away by his friends when he was taken to the hospital and they disposed of it. However, that is simply a possibility, not a probability, and the Court cannot draw the inference that the defendants' counsel requested. Accordingly, this Court concludes that Pruitt did not have a gun when he was in the subject establishment.
It is true as plaintiffs counsel points out in his brief that "[i]t is well established that an employer is liable for the willful torts of his employee when they are committed within the scope of his employment and in furtherance of the employer's business." Cardona v. Valentin,160 Conn. 18, 22 (1970). However, as cited by plaintiff "the test in Connecticut as to whether an employee is acting within the scope of his or her employment rests on whether the employee was furthering the employer's business. Nutt v. Norwich Roman Catholic Diocese921 F. Sup. 66, 70 (D. Conn. 1995)."
It is well settled law that the plaintiff must establish that the employee's tortious conduct "was actuated at least in part by a purpose to serve a principal. . . . Where that is not established, "the principal is not liable." A-G Foods, Inc. v. Pepperidge Farm, Inc. 216 Conn. 200,208, 210 (1991) which also held in pertinent part "We have long adhered to the principle that in order to hold an employer liable for the intentional torts of his employee, the employee must be acting within the scope of his employment and in furtherance of the employer's business . . . But it must be the affairs of the principal, and not solely the affairs of the agent, which are being furthered in order for the doctrine to apply." Id. 208.
Restatement (Second) Agency, Section 245 "Use of Force", states, in CT Page 3444 pertinent part: "Comment f. Servant actuated by personal motives. The liability of a master for the use of force by a servant is not prevented by the fact that the servant acts in part because of a personal motive, such as revenge. The master, however, is relieved from liability under the rule stated in this Section if the servant has no intent to act on his master's behalf, although the events from which the tortious act follows arise while the servant is acting in the employment and the servant becomes angry because of them. The fact that the servant acts inan outrageous manner or inflicts a punishment out of all proportion tothe necessities of his master's business is evidence indicating that theservant has departed from the scope of employment in performing the act"
(Emphasis added).
In Sheridan v. Desmond 45 Conn. App. 686 (1997), the Court stated, footnote 10 pages 693-4 as follows: "Conduct of a servant is not within the scope of employment if it is different in kind from that authorized. . ., or too little actuated by a purpose to serve themaster." (Emphasis added). Id, 693-94 n. 10. In Sheridan the Court, based upon an Ohio case which involved the unprovoked shooting of a patron by a tavern owner, stated "[A]n intentional and willful attack committed by [an employee], to vent his own spleen or malevolence against the injured person, is a clear departure from his employment, and his principal or employer is not responsible therefor. Vrabelv. Acri 156 Ohio St. 467, 474, 103 N.E.2d 564, at 568. (1952)." Sheridan, supra at 695. In Turner v. American DistrictTelegraph and Messenger Co. 94 Conn. 707, (1920), the Court stated that a wordy altercation in which sharp language was used . . . These words lead to a scuffle between the two men, and the scuffle ended by Sullivan drawing his revolver and shooting the plaintiff in the left leg. The Court stated, inter-alia:
"The test of liability is not to be found in anything so artificial as its occurrence during the period of the servants employment . . . It matters not that the employees working hours have expired . . . If heturned aside from his work or task to do something unrelated to themaster's business, he is, as long as he is so engaged, as much actingoutside the scope of his employment as he would be were his working dayended or his task completed. . ."(Emphasis added). Id, 713. The Court found that the fighting words and provocative language used "could not have been spoken [by him] either as a means of furthering his employer's business or with the purpose of furthering it" Id, 714.
The following facts clearly demonstrate that the actions of Newkirk against
Pruitt were personal towards Pruitt by Newkirk: CT Page 3445
 1. Pruitt testified that Newkirk did not like him and struck him without provocation. Pruitt did not give any reason why Newkirk who seemed to be angry with another customer punched Newkirk, the so called "sucker punch". There was no evidence that the punch was related to the business of the defendants.
 2. Newkirk's act in punching Pruitt without provocation and subsequently lying in wait for Pruitt to come back while Newkirk was armed with the Magnum was not furthering his employer's business.
If, as the Court has concluded, Pruitt did not have a gun, then the shooting of him by Newkirk was an outrageous act which was far beyond and excessive to what was necessary. Newkirk was 6'4" tall weighing at least 220 pounds. Observing Pruitt in Court, Newkirk was clearly heavier and taller than Pruitt. There was testimony from police officers that Newkirk was a tough guy. James had testified that he had taken on five individuals at the bar who were causing a disturbance and beaten up all five at the same time. It is clear to this Court that shooting Pruitt was an outrageous action and far in excess of the force needed to stop Pruitt. It is clear to this Court that Newkirk could have beaten up Pruitt without a gun, that is, he could have controlled Pruitt without shooting him. The Court, therefore, draws the conclusion from this evidence that Newkirk was personally motivated to shoot Pruitt either because of the previous dispute when Pruitt attempted to enter the first time, or Pruitt's reputation or because he expected him to come back armed and/or dangerous, and since he could have used less force to control Pruitt than he did, he was acting outside the scope of his employment. There was no need for Newkirk to use a gun to protect himself, the employees or the patrons. If Pruitt did not have a gun as the Court has concluded from the evidence, as stated in Sheriden, supra, an intentional and willful act committed by an employee to vent his own spleen or malevolence against the injured person is a clear departure from his employment and his principal or employer is not responsible therefor. As stated in A-G Foods, supra, plaintiff must establish that the employee's tortious conduct was actuated at least in part by a purpose to serve the principal. Suffice it to say that the plaintiff has not met his burden of proof that Newkirk was acting for the purpose or in the furtherance of his master's business. He departed from same when he used a gun which was both outrageous by him and inflicted a punishment out of all proportion to the necessities of his master's business.
If, on the other hand, if Pruitt had returned with a gun, shooting Pruitt would not have been outrageous or excessive force. It probably CT Page 3446 would have been self defense. However, for all the reasons stated, there was no evidence that Pruitt had a gun.
3. Was The Continued Employment of Newkirk By The Defendants Ratification of The Acts of Newkirk?
Plaintiff claims that allowing Newkirk to continue to work at the Main Tower Cafe amounted to a ratification of the tort committed upon the plaintiff In his Reply Brief plaintiff cites as authority for the ratification argument cases from other jurisdictions. He cites two Texas cases holding that when an employer confirms or fails to repudiate an unlawful act of an employee of which the employer is aware, then that is ratification. Under Minnesota law he claims an employer may ratify the act of an employee by failing to discharge or even reprimand the employee for illegal activity. Where plaintiffs argument fails as to ratification is that James never believed that Newkirk had committed an illegal act. Newkirk told him that the reason he shot Pruitt was because Pruitt returned with a weapon, and that he was, therefore, shooting in self defense. Although this statement would ordinarily be hearsay, it was admitted at the trial not for the truth of what Newkirk allegedly said, but rather for its effect upon the hearer, James and/or James' state of mind. His state of mind or the effect upon him was that he believed that Newkirk had not done an illegal act, that his actions were in self defense, and further, he was aware that no arrest was being made or had been made of Newkirk.[3] Accordingly, he did not believe he was ratifying an illegal act because he believed it was not illegal. Plaintiff would have to show that James continued to employee Newkirk even though he knew he had committed an illegal act. Such proof was not forthcoming. Therefore, there was no ratification of the shooting of Pruitt by Newkirk.
4. Are The Defendants Liable For Negligent Supervision?
The short answer to that question is no. There is no credible evidence that would enable the plaintiff to prove by a preponderance of the evidence that James knew that a gun was often kept in the disc jockey's cabinet. The concealment of the gun was in direct violation of James' rules as he testified. Further, the defendants had no reason to believe that Newkirk would have acted as he did outside the scope of his employment.
Assuming arguendo that James knew that the gun was located where it was, that still does not make him liable for the acts of Newkirk. InCardona v. Valentin, supra, the Court stated in pertinent part: "[i]t is elementary that, in a negligence case, a casual relationship between a defendant's wrongful conduct and a plaintiffs injury must be established CT Page 3447 in order for the plaintiff to recover damages. . . Ordinarily, it is a question of fact whether the negligence of a defendant was the proximate cause of a plaintiffs injuries. . . In a situation in which the negligent conduct of a defendant is an ingredient, but not the initiating force, in a sequence of events culminating in an injury to a plaintiff, the Restatement on Torts states the rule in this way: "Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionallycaused by a third person and is not within the scope of the risk createdby the actor's conduct." (Emphasis added).
This Court finds the harm was not within the scope of the risk created by James knowing that the gun was in the disc jockey's booth. The possible negligent supervision was not the proximate cause of the plaintiffs injuries because they were caused by Newkirk acting out of the scope of his employment with the defendants having no knowledge that Newkirk would act the way he did.
5. Piercing The Corporate Veil.
Since the Court has found that the defendants are not liable for either negligent supervision or for the outrageous act of Newkirk, there is no need to address the issue of whether or not the Court would have pierced the corporate veil of Main Tower Inc. However, the Court will comment as follows: The Court believes that the corporate veil could not have been pierced. In Estate of Peter G. Stotz v. John Everson et. al1994 WL 702867 (Conn.Super.) November 8, 1994 Housing session of the Judicial District of Stamford-Norwalk No. CV 94 06 29 06, Tierney, Judge, the Court stated in pertinent part: "The circumstances that control is exercised merely through dominating stock ownership is not enough to invoke power to pierce the corporate veil. . . There must be such domination of finances, policies and practices that the controlled corporation has no separate mind, will or existence of its own and is but a business conduit for this principal.". . . There must be alleged a sufficient factual basis for a Court to pierce the corporate veil citingUnited Electrical Contract v. Progress Builders, 26 Conn. App. 749, 756
(1992). Although there were allegations of sole stock ownership, sole president and sole director, in the case at bar, that is not necessarily sufficient to pierce the corporate veil. An allegation must be made and proof given that the corporation has no mind of its own and is totally controlled in all aspects by the sole stockholder in this case. Since the Courts have held that they will allow piercing of the corporate veil only under exceptional circumstances, more has to be plead and proven in order for the Court to pierce the corporate veil. Counsel are referred to Judge CT Page 3448 Tierney's decision and the Appellate case cited therein.
 CONCLUSION
While the Court has sympathy for Pruitt for the injuries he sustained and appreciates the valiant efforts of the plaintiffs attorney, plaintiffs cause of action would be against Newkirk individually and not the presently named defendants.
For the foregoing reasons, judgment is entered for the defendants.
Rittenband, JTR